SAPULPA TANK COMPANY, a corpo-
ration, Plaintiff,

v.

A. GREENSPON PIPE COMPANY, a
corporation, Defendant.

No. 61 C 262(1).

United States District Court
E. D. Missouri, E. D.

May 23, 1962.

————◆————

Lon Hocker, Hocker, Goodwin & Mac-Greevy, St. Louis, Mo., for plaintiff.

Leland Jones, St. Louis, Mo., for defendant.

HARPER, Chief Judge.

This suit was instituted in this court by the plaintiff, an Oklahoma corporation, against the defendant, a Missouri corporation, for an amount in excess of $10,000. The case was properly brought here, the court having jurisdiction based on diversity of citizenship and more than $10,000 involved.

The facts disclose that on March 2, 1961, the parties entered into a contract wherein the plaintiff agreed to dismantle a 35,000 barrel tank and a 59,500 barrel tank belonging to the defendant, which were located in St. Louis County. Both tanks were all welded steel tanks and had been purchased by the defendant from the St. Louis Water Company. The property on which the tanks were located was being taken for highway purposes and the water company sold the tanks to the defendant. It was necessary to dismantle the tanks within a rather limited time.

The second telegram sent by the defendant on March 2, 1961, at 11:50 a. m. (Defendant's Exhibit D), provided that the tanks would be taken down in first-class workmanship order and marked for re-erection for a total sum of $11,800. Following the telegram, a contract (Plaintiff's Exhibit 1—Defendant's Exhibit N) was signed by the parties, which contract is dated March 2, 1961. The contract provides that the dismantling of said tanks was to be plate by plate by burning through the welded seams thereof. There is no dispute that the tanks were dismantled after the contract was entered into within the time provided in the contract. The contract further provided that the defendant was to pay the plaintiff $4,800 within five days after the completion of the dismantling of the first tank and the sum of $7,000 within five days after the dismantling of the second tank. It is undisputed that no payment has been made by the defendant to the plaintiff for the dismantling of the tanks.

The plaintiff wired the defendant on April 11, 1961 (Plaintiff's Exhibit 2), requesting payment. The defendant on April 13th, in reply to plaintiff's wire of April 11th, wrote the plaintiff (Plaintiff's Exhibits 3), and indicated that the defendant was ready to make the payments for the dismantling of the tanks as soon as it could determine if some eight of the steel plates of the small tank from the second ring, which the defendant believed had been dropped by the

plaintiff in the dismantling process, had been sprung. An inspection arranged by the defendant disclosed the eight plates were not sprung. On May 1st the plaintiff again wired defendant (Plaintiff's Exhibit 4), advising that the plaintiff understood the defendant had had the allegedly damaged plates inspected, and that the inspection had disclosed no damage and that, therefore, the plaintiff was expecting immediate payment.

Following this telegram, the defendant, on May 2nd, wrote plaintiff (Plaintiff's Exhibit 5) that the defendant expected to take care of the payment for dismantling of the tanks by the end of that week. The plaintiff thereafter turned the matter of collection for the dismantling of the tanks over to its attorney, and the attorney wrote the defendant. On June 15th, in reply to the attorney's letter of May 25th, the defendant wrote the plaintiff's attorney (Plaintiff's Exhibit 7), seeking credit for the inspection charges for the purported damaged plates amounting to some $39.89, $50.00 for setting up the plates for inspection, and $146.25 for additional charges by the hauling company due to delay purportedly the result of plaintiff's failure to have a crane available during one period of the dismantling. The letter further indicated that if the plaintiff would give credit for these items that the defendant would assign an account it had of $11,000 due it from a major construction company, payable within thirty days, and would pay the difference of $800.00, less the credits mentioned above. The letter urged acceptance of the assignment in view of business conditions in steel.

Thereafter, on July 27, 1961, the plaintiff filed suit to recover under its contract for the dismantling of the tanks. The defendant's answer seeks an offset against the $11,800 of $4,586.14 for the plaintiff's failure to promptly perform the work of dismantling the tanks in a workmanlike manner, and that as a result thereof the defendant incurred expenses and was damaged in the sum of $4,586.14. This was the first indication the plaintiff had of any claim of any such damages.

The testimony discloses that the tanks were dismantled within the time provided for in the contract and were dismantled by burning through the welded seams, except at the bottom of the tank. There was testimony that in some instances the cut was outside the welded seams, but as Mr. Koch, the superintendent of the Nooter Company, testified, this would occur to some extent in every instance of dismantling a tank because "all workmen are human." Most of the cut outside of the welded seams was in the plates from the upper part of the tanks, and in those instances it would be necessary to cut the plate in every instance, because the plates were only one-sixteenth of an inch apart as erected, and the cut itself was approximately one-eighth of an inch. The cuts, however, in some instances would vary as much as an inch from the seam.

The testimony disclosed that any dismantled welded tank to be re-erected for the storage of water or oil would have to be refabricated. Mr. Koch, who was called by the defendant as a witness, would not say that the steel was not suitable for re-erection as a tank. Richard Moon, called by the defendant as an expert, testified that many of the cuts were out of the weld, but admitted that the cuts of the upper plates of the tank had to extend into the plate, because the cut was wider than the weld. One must realize that a cutting torch is not like a knife, but will cut fairly straight if properly guided, although the guiding often presents a problem. There is no dispute that the bottom ring was not cut through the weld to the floor, but above the weld, but as witness Moon stated, there was a dispute in the trade as to whether the proper manner on the bottom part was to cut through the weld at the floor or cut through the plate above the weld. The contract did provide, however, that the cutting would be through the welded seams.

There was considerable testimony with respect to damage to tie plates. Some of the pictures and the physical exhibits disclose what would appear to be excessive burning. One must realize that in dealing with the tie plates that we are dealing with a very, very minor item insofar as the tanks are concerned, that what in most instances causes excessive burning of holes is the existence of rust, and if there were rust in the tank it would usually be more prevalent around the tie plates than at other places. It would be expected in the re-assembling of a tank that had been erected as long as these tanks had been erected that when they are dismantled and re-assembled, many of the tie plates would have to be replaced because of rust.

A review of the testimony and the exhibits leads the court to the conclusion that the two tanks were dismantled properly and in accordance with the contract, with the exception of the lower ring of the tank, where the cut was made through the plate rather than the seam. There is no testimony before the court as to the cost to square this particular part of the plates, but the witness Moon did say that the cost of cutting all the plates to standard size, replacing the damaged parts to make the tank as salable as a new tank, would be, $18,000. Moon further testified that if in dismantling the cut had been through each weld as the contract set out, the dismantled material would be salable as a new tank. This testimony is completely unworthy of belief. Every witness, including Moon, admits that the cut in the upper seams of necessity was wider than the seam itself, and all of the other witnesses who knew anything about tank construction stated that if used for water or petroleum all of the weld had to be removed, and any dismantled welded tank had to be re-worked before it could be re-erected for those purposes.

While Moon would have us believe that it would be necessary to do this work before the tanks could be re-erected, Mr. Koch of Nooter Company, who has had more experience than Moon in this matter, stated that as the tanks now are, with limitations, they could be rebuilt as a tank, and it was his company which, at the defendant's request, had made one of the original inspection for damages to some eight plates and found none. If it would cost $18,000 to refabricate the two tanks, as testified to by the witness Moon, there being seven rings in each tank, a total of fourteen, as well as the bottom and top, the court could fairly assume that it would take approximately $1,000 to refabricate each ring, or $2,000 to refabricate the lower ring of the two tanks, and while there are four sides to the plate and the cut above the seam was only on the lower part of the plate, the court will find the damage due to failure to cut through the lower seam of the lower ring in the sum of $1,000, and will accordingly reduce plaintiff's claim from $11,800 to $10,800, and will grant judgment to the plaintiff in the sum of $10,800 on the contract.

The contract further provides for the recovery of expenses and attorney's fees. It was stipulated by the parties that if the court found under the terms of the contract that the plaintiff was entitled to recover attorney's fees and expenses, that $2,000 was the reasonable amount. Under the terms of the contract the plaintiff is entitled to recover $2,000 as attorney's fees and expenses.

The court accordingly will give judgment to the plaintiff for the sum of $12,800 with interest 6% from this date.

This opinion is adopted by the court as the findings of fact and conclusions of law, and the clerk will prepare a judgment to be entered by the court in accordance with the opinion.